UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plainitff,          Hon. John Corbett O'Meara

v.          Case No.  05-CR-90014 - 01

MOHAMAD ALI FAWAZ,

          Defendant.

_____/

## OPINION SUPPORTING COURT'S NOT GUILTY RULING

After presentation of proofs and closing arguments, neither party requested formal findings and conclusions pursuant to Rule 23 of the Federal Rules of Criminal Procedure.  The court has, therefore, entered its decision that the defendant is not guilty in this matter by a general finding pursuant to Rule 23.

The court nevertheless is making Findings of Facts and Conclusions of Law because it believes that the exchange between counsel and court during the conclusion of the courtroom proceedings likely led counsel to believe that a formal Rule 23 request had been made, and because it believes this matter deserves detailed Findings of Facts and Conclusions of Law, and this Opinion, supporting the "Not Guilty" finding.

Marriage, a formal, public and enforceable commitment of one to another exists in most of the world's discernable cultures.  However, it is not recognized by the same public ceremony nor informed by identical ideation in all cultures and religions.

A "marriage" may be formed, as it is in some places, by simple cohabitation; in most cultures and religions, however, it is marked by some form of public ceremony, often elaborate and expansive both in time and cost.

Depending upon one's religion and cultural background, marriage may be a lifetime commitment.  No divorce or it may be to more than one wife.  (To more than one husband, too, perhaps.)  It may be, as is true in modern times in most Judaic and Christian cultures, based on the presumption that the couple being married found each other and "fell in love."  Of course, even in these cultures, until relatively recent times, there were "marriages of convenience," the convenience usually being the economic or hegemonic interests of the fathers of the bride and the groom.  This was especially true if royal families were involved.

Where divorce is allowed, it takes many forms.  It can be as complicated and elaborate as it sometimes seems to be in western society or as quick and easy (or so it is said) as the husband simply announcing that the marriage has ended.

Judge Richard Posner, in one of his books exploring the economic aspects of practically everything, has said that the decision to marry is often informed, at least to some extent, by economic considerations.  <u>See</u> <u>generally</u> Richard A. Posner, <u>Sex and Reason</u> (1992).

In this case, in order to convict the defendant, the Court would need to conclude that he entered into his marriage to Amal Fawaz without intending it to be a marriage at all, but rather a device to allow him to transport himself to the United States, and eventually obtain a green card.

2

However, the evidence in this case does not support a conclusion that such fraudulent intent was present at the time of defendant's marriage.  In fact, the evidence that one might reasonably say supports the government's arguments that the marriage was fraudulent[1] is substantially outweighed by the evidence one might reasonably point to which suggests that the marriage was not fraudulent at all.[2]  As this Court (and Judge Posner apparently) believes, most marriages are motivated by a congeries of complicated, often inconsistent, considerations.  This does not render a marriage any less a marriage or any less enforceable in most cultural/religious/legal situations.

The government makes much of the fact that all witnesses agreed that this marriage was not "consummated."  Surely here the absence of conjugal sex must be rare after marriage (or these days, <u>before</u> marriage in many places).  But Amal and

---

[1] a.  He fought with Amal.
 b.  Mohamad returned to Lebanon and stayed there without communicating with Amal for many months.  Mohamad allegedly protected his married entree into U.S. by filing married certification in Lebanon.
c.  Mohamad wrote Michigan Circuit Judge Callahan when he learned that Amal filed for annulment.
d.  Mohamad allegedly told Amal (overheard by her mother) that the only reason he married her was to get to America.
e.  Mohamad finally "attempted" to get back into this country illegally.

[2] a.  He fought with Amal.
b.  After Amal's first immigration papers were filed, he lived in a house with Amal her mother, and her sisters.  The house was owned by Amal's father who allegedly told defendant and Amal they could not "consummate" their marriage until Mohamad moved to a place where he was supporting the two of them.
c.  The defendant worked for Amal's father.
d.  He apparently worked long hours at the father's gas station.
e.  One of the couple's fights ended in his being walking out or being kicked out.
f.  Amal and Mohamad talked of divorce.
g.  Amal and Mohamad talked to Amal's father about divorce.
h.  Mohamad and Amal had "intimate moments" short of conjugal sex.
i.  Amal needed to finish high school.  There is some evidence that it was not unusual in the Moslem religious and cultural community to afiance a very young woman, leave her untouched sexually until she is older, finishes, for example, high school, gets out of her parents' house and the husband can support her independently.

Mohamad Fawaz were not part of this culture.  Independent of that fact, Amal's age at the time the parties considered themselves "married" (16) and, among other things, the atmosphere in which the parties lived, would seem to support the defendant's testimony that he followed the will of Amal's father who did not want the marriage "consummated" until Mohamad Fawaz was able to house and support his wife independently.

With this in mind, the court makes the following findings of fact and conclusions of law.

### **FINDINGS OF FACT**

1. Defendant Mohamad Ali Fawaz is a Lebanese citizen, originally from the town of Tebnine.  He was born on May 1, 1976.

2. Amal Fawaz was born on August 1, 1985 in the United States.  She has both Lebanese and American citizenship.  At all relevant times she was a permanent resident of Dearborn, MI.

3. During the summer of 2000, Amal vacationed in Tebnine, Lebanon for three months with her father and sister.

4. Mohamad's parents live next door to Amal's paternal grandparents in Tebnine.  Pursuant to their culture, Mohamed asked Amal's father, Hussein Fawaz, for permission to speak with Amal during the summer of 2000.

5. Mohamad was aware that Amal was a United States citizen when he asked her father if he could speak to her.  At all relevant times, Mohamad was aware that marrying someone for the sole purpose of obtaining legal immigrant status is a violation of United States law.

6. For approximately one month, Mohamad came to visit Amal daily. They got to know each other. Pursuant to their culture, the two did not touch each other.

7. Amal returned to Dearborn in late August of 2000 to return to high school. Mohamad and Amal continued to communicate via email daily and on the phone approximately once a week. Mohamad and Amal decided that they would become engaged. Both of their parents approved.

8. Amal came back to Tebnine in the summer of 2001. Mohamad and Amal had an engagement ceremony on August 18, 2001. A religious cleric presided over the ceremony. The ceremony was attended by over 100 guests, including many family members of both Mohamad and Amal. The couple appeared to be happy during the ceremony. Mohamad's family paid Amal's family a dowry of $3,000 and some gold jewelry. The families entered into a contract which provided that if Amal asked for a divorce, she would return the dowry, and if Mohamad asked for a divorce, his family would pay her family $35,000. This ceremony was sufficient to constitute a marriage in the Muslim culture.

9. Amal believed she was entering into a valid marriage.

10. Amal returned to the United States in the fall of 2001. Mohamad remained in Lebanon. The two continued to speak by telephone and email regularly. They decided that Mohamad would come to the United States. In November 2001, Amal filed a petition with U.S. immigration asking that Mohamad be given a temporary visa as an alien fiance. Because Amal was not financially self-sufficient, her father Hussein signed an affidavit claiming that he would support Mohamad if necessary. Mohamad was granted a K-1 visa at the U.S. embassy

in Damascus, Syria on April 29, 2002.

11. Mohamad entered the United States at Detroit Metropolitan Airport on May 6, 2002. On May 25, 2002, Mohamad and Amal had another marriage ceremony conducted by a Muslim cleric. They received a marriage license from the State of Michigan. Amal's parents each signed a consent form to allow her to marry because she was under the age of 18 at the time of the marriage.

12. On May 31, 2002, Mohamad's immigration status was adjusted to conditional resident alien. His immigration status was subject to the condition that he retain the status of being married to a United States citizen.

13. From May 2002 until February 2003, Mohamad lived with Amal, her mother, and three of Amal's siblings in a house in Dearborn. Mohamad slept in his own bedroom. Amal shared a room with her sisters and continued her high school education. Amal's father Hussein instructed Mohamad that he could not consummate the marriage under that roof, but must wait until Mohamad was financially able to provide for their own house.

14. Mohamad and Amal did not consummate their marriage.

15. On a number of occasions, Amal snuck into Mohamad's room at night and the two engaged in conduct expressing physical affection.

16. While he was living with Amal and her family, Mohamad worked at the gas station owned by Amal's father. He worked 56 hours per week during most weeks, though during some weeks he worked as many as 77 hours. He was paid $8.00 an hour. The couple opened a joint bank account. The sole income source for this account was Mohamad's wages from the gas station. Amal and

  Mohamad both used this account to make purchases.  Amal was attending high school and did not have a regular source of income at this time.

17. During the time the couple was living together in Dearborn, they visited Mohamad's boyhood friend and some of his relatives.  The friend and relatives believed that Amal and Mohamad interacted as a normal married couple would.

18. In the summer of 2002, Amal took a two month vacation to Lebanon.  Mohamad remained in Dearborn.  Amal's mother and Mohamad both provided funds to pay for the trip.

19. Mohamad and Amal began to regularly get into arguments about their future in late 2002 and early 2003.  They argued about money and Mohamad's inability to provide a house for the couple, among other things.

20. On February 22, 2003, the couple had an argument.  Amal told Mohamad that she wanted a divorce.  The couple consulted Amal's father about the possibility of divorce.  Amal's father called Mohamad's family in Lebanon to inform them of the marital problems and the possibility of divorce.  The couple was scheduled to attend an appointment with a Muslim cleric to discuss the possibilities of divorce or reconciliation on the morning of February 27, 2003.

21. Mohamad withdrew $2,500 from the couple's joint bank account on February 24, 2003.  He returned to Lebanon on February 26, 2003.  He did not attend the appointment scheduled with the Muslim cleric.  Mohamad and Amal have had no contact since he left the country.

22. On February 27, 2003, a nurse practioner examined Amal Fawaz and determined that her hymen was intact.

23. In March of 2003, Amal filed for an annulment of the marriage in Wayne County Circuit Court, claiming that Mohamad entered the marriage for the sole purpose of obtaining legal residence in the United States. She served the complaint on Mohamad in Lebanon. Mohamad submitted a letter to the Wayne County Circuit Court claiming that he did not enter the marriage fraudulently, but left the country to care for his sick mother.

24. In May of 2003, Mohamad obtained a Lebanese marriage certificate for his and Amal's marriage.

25. The marriage was annulled by a judgment of the Wayne County Circuit Court in July of 2003.

26. Amal Fawaz remarried on February 14, 2004.

27. Mohamad reentered the United States from Canada in May, 2004. After consulting with an immigration attorney, on May 26, 2004, Mohamad filed a petition to have the condition of being married to a U.S. citizen removed from his resident alien status. His reason for removal was that he entered into the marriage in good faith but the marriage was terminated. This request was denied in a letter dated June 18, 2004.

28. After his petition was rejected, Mohamad remained in the United States and lived with his aunt. Mohamad was taken into administrative custody on April 11, 2005.

## **CONCLUSIONS OF LAW**

1. The government must prove beyond a reasonable doubt the three elements of the crime of marriage fraud: first, that the defendant entered into a marriage;

    second, that the defendant knowingly entered into the marriage for the purpose of evading the United States immigration laws, and third, that the defendant knew or had reason to know of the relevant immigration laws.  <u>United States v. Chowdhury</u>, 169 F.3d 402, 406 (6th Cir. 1999).

2. The first element of the crime, that defendant entered into a marriage, has been proved beyond a reasonable doubt.

3. The third element of the crime, that defendant knew that entering into a marriage for the purpose of evading the United States immigration laws was illegal, has also been proved beyond a reasonable doubt.

4. The second element of the crime, that defendant entered the marriage for the purpose of evading the United States immigration laws, has not been proved beyond a reasonable doubt.

                              s/John Corbett O'Meara  
                              John Corbett O'Meara  
                              United States District Judge

Dated:  August 9, 2005